**NATIONAL RAILROAD PASSENGER CORPORATION, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Baltimore and Ohio Railroad Company, et. al., Intervenors.**

No. 77–1523.

United States Court of Appeals, District of Columbia Circuit.

Argued April 4, 1979.

Decided July 16, 1979.

Howard R. Moskof, Washington, D. C., with whom Carol A. Mutter, Washington, D. C., was on the brief, for petitioner.

Henri F. Rush, Associate Gen. Counsel, I.C.C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, and Alan J. Thiemann, Atty., I.C.C., Washington, D. C., were on the brief, for respondent Interstate Commerce Commission.

James H. Pipkin, Jr., Washington, D. C., for intervenors B & O, C & O, and Penn Central.

Urchie B. Ellis, Richmond, Va., was on the brief for intervenor Richmond, Fredericksburg and Potomac Railroad Co.

Robert Lewis Thompson and Edward E. Lawson, Jr., Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent United States.

Before McGOWAN and TAMM, Circuit Judges, and HOWARD F. CORCORAN,* Senior District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In this case, as in *National Railroad Passenger Corp. v. ICC*, —— U.S.App.D.C. ——, 610 F.2d 865 (D.C.Cir. 1979), we are called upon to review the Interstate Commerce Commission's (Commission) application of section 402(a) of the Rail Passenger Service Act of 1970 (1970 Act), as amended by the Amtrak Improvement Act of 1973 (1973 Act), 45 U.S.C. § 562(a) (1976) (current version at 45 U.S.C.A. § 562(a) (1978)).[1] We decide whether the Commission correctly applied section 402(a) to determine the amount of payments the National Railroad Passenger Corporation (Amtrak) owes the Washington Terminal Company (WTC) for use of WTC's all-passenger terminal of which Amtrak is half-owner and at least an

---

* Sitting by designation pursuant to 28 U.S.C. § 294(c).

1. *See* note 10 *infra.*

eighty-five percent user.[2] We hold that, in the context of this case, the Commission acted properly in charging Amtrak its allocated share of WTC's operating costs pursuant to a pre-existing agreement governing use of the passenger terminal. Further, the Commission's assessment of specific charges to Amtrak was "just and reasonable."

I

WTC owns and operates a joint passenger service terminal in Washington, D. C. The terminal consists of Union Station, the Eckington Car and Engine Yard, which houses tracks, roundhouses and other maintenance facilities, and the Virginia Avenue track connection. Amtrak has voluntarily become a party[3] to a 1907 Operating Agreement, Joint Appendix (J.A.) at 188–229, which apportions expenses of WTC among the terminal's users.[4] Each user pays (1) all costs directly generated by its operations, and (2) an allocated share, based on percentage of use, of the remaining common costs.[5]

From Amtrak's creation in 1970, see Rail Passenger Service Act of 1970, Pub.L. No. 91–518, 84 Stat. 1327 (current version in scattered sections of ch. 14, 45 U.S.C.A. (1978)), until July 1, 1973, Amtrak operated intercity passenger trains previously run by the Trustees of the Property of Penn Central Transportation Company (Penn Central), the Baltimore and Ohio Railroad Company (B & O), The Chesapeake and Ohio Railway Company (C & O), and the Rich-

mond, Fredericksburg and Potomac Railroad Company (RF & P). Amtrak obtained access to the terminal by agreeing with the railroads to use their rights of access under the 1907 Agreement. Amtrak's agreements with those railroads expired July 1, 1973; and it then petitioned the Commission to determine WTC's just and reasonable compensation for continued use of the terminal. In the interim, WTC continued to bill the parties to the 1907 Agreement who then forwarded to Amtrak the charges relating to its operations.

In a decision issued on June 27, 1975, Division 3 of the Commission ordered Amtrak to become a party to the 1907 Agreement and to pay its resulting share of costs on the same basis as other user railroads, with two adjustments. *Amtrak & Washington Terminal Company, Use of Tracks & Facilities & Establishing Just Compensation (WTC I)*, 348 I.C.C. 86 (1975). First, the Commission held that "business" cars, i. e., official cars of a railroad used to transport railroad officers, should be counted in computing each railroad's use of the terminal. *Id.* at 104–05, 108. Second, the Commission ordered the adjustment of Amtrak's payments to account for conversion of the old Union Station into a National Visitor Center while a new station was being built adjacent to the Visitor Center. *Id.* at 107–08. Specifically, the Commission stated that the area of the station devoted to the construction of the Visitor Center should be "quasi-excessed,"[6] by removing from the

---

2. Amtrak challenges two orders entered by the Interstate Commerce Commission (Commission) in 1975 and 1977 in ICC Finance docket No. 27708, Amtrak & Washington Terminal Company, Use of Tracks & Facilities & Establishing Just Compensation.

3. *See* text at —— of 197 U.S.App.D.C., at 884 of 610 F.2d, *infra.*

4. At the time of the Commission's decision in Amtrak & Washington Terminal Company, Use of Tracks & Facilities & Establishing Just Compensation (*WTC II*), 348 I.C.C. 859 (1977), user railroads included Amtrak, the Southern Railway (Southern), the Baltimore and Ohio Railroad Company (B & O), and the Trustees of the Property of Penn Central Transportation Company (Penn Central).

5. Such common expenses include certain operating costs, rental, depreciation, and taxes. *See* Verified Statement of C. W. Shaw, Jr., Joint Appendix (J.A.) at 233.

6. Property that is "quasi-excessed" is treated as if it had been actually "excessed." The 1971 Amendments to the 1907 Operating Agreement define "excessing" by providing that property, which is declared unnecessary for railroad purposes, is to be removed from the WTC rental base. Further, costs of converting excess property to non-railroad use are not allocated to user railroads. *Id.* at 102–03. The old terminal was actually "excessed" to the Department of Interior on July 1, 1976. *WTC II*, 348 I.C.C. at 867. The Commission ordered that Amtrak's payments prior to July 1, 1976, reflect "quasi-excessing" for that property removed from use

rental base the area occupied by the Visitor Center and by setting apart the costs related to the Visitor Center. *Id.*

Amtrak petitioned for reconsideration of the Commission's decision. Shortly thereafter, Amtrak acquired the interests of Penn Central and its subsidiary, the Philadelphia, Baltimore and Washington Railroad Company (PB & W) in the terminal. Thus, Amtrak now holds one-half ownership of WTC, one-half interest in the maintenance facilities, and sole ownership of the Virginia Avenue connection.[7]

Upon reconsideration in 1977, the Commission reaffirmed the 1975 order that Amtrak be joined to the 1907 Agreement. *Amtrak & Washington Terminal Company, Use of Tracks & Facilities & Establishing Just Compensation (WTC II)*, 348 I.C.C. 859, 859–60 (1977). The Commission, however, made two modifications in the 1975 decision. The Commission determined that Amtrak should not pay ownership expenses and rent for those portions of the Union Station building removed from railroad service by the Visitor Center, but that Amtrak should pay its share of other common operating expenses. *Id.* at 865–68. The Commission also reversed its 1975 decision to include business cars in the railroad car counts for the purpose of allocating Amtrak's share of the costs. *Id.* at 868.

Amtrak's petition for review in this court followed the 1977 Commission decision.[8] Prior to oral argument, Amtrak voluntarily signed the 1907 Agreement, thereby mooting any dispute over the Commission's power to order Amtrak to join.[9] Amtrak continues, however, to protest the terms of the Agreement as applied to it.

## II

Amtrak strongly attacks the Commission's decision requiring it to join the 1907

Agreement on the same basis as other user railroads. Specifically, Amtrak charges that it is being forced to bear the cost of non-incremental services although no quality standards govern WTC's service to Amtrak. According to Amtrak, this result violates the express statutory mandate of section 402(a) of the Rail Passenger Service Act, which provides, in part:

> The Corporation may contract with railroads or with regional transportation agencies for the use of tracks and other facilities and the provision of services on such terms and conditions as the parties may agree. In the event of a failure to agree, the Interstate Commerce Commission shall, within ninety days after application by the Corporation, if it finds that doing so is necessary to carry out the purposes of this chapter, order the provision of services or the use of tracks or facilities of the railroad by the Corporation, on such terms and for such compensation as the Commission may fix as just and reasonable, and the rights of the Corporation to such services or to the use of tracks or facilities of the railroad or agency under such order or under an order issued under subsection (b) of this section shall be conditioned upon payment by the Corporation of the compensation fixed by the Commission. *In fixing just and reasonable compensation for the provision of services ordered by the Commission under the preceding sentence, the Commission shall, in fixing compensation in excess of incremental costs, consider quality of service as a major factor in determining the amount (if any) of such compensation.*

45 U.S.C. § 562(a) (1976) (emphasis added).

In *National Railroad Passenger Service Corp. v. ICC,* 197 U.S.App.D.C. at ——, ——, 610 F.2d at 875, 880, we held

---

for the construction of the Visitor Center. *Id.* at 861.

**7.** *See* Verified Statement of R. R. White, J.A. at 601; Verified Statement of Garth E. Griffith, *id.* at 603–04; *WTC II*,, 348 I.C.C. at 861–63 (1977).

**8.** Intervenors in this petition for review are the B & O, The Chesapeake and Ohio Railway Company (C & O), Penn Central, and Richmond, Fredericksburg and Potomac Railroad Company.

**9.** *See* Brief for the Commission, Addendum A.

that section 402(a)[10] demands only that the Commission distinguish between incremental[11] and non-incremental costs when computing Amtrak's payments in consideration for services, but not when considering the appropriate charge for its use of track and facilities. Further, we held that the Commission may require Amtrak to pay for non-incremental services in the absence of performance quality standards if the Commission cannot reasonably distinguish between incremental and non-incremental service costs on the record before it, and if the Commission's action will not cause Amtrak obvious detriment by requiring payment for poor quality services. If this restrictive test is met, the purposes of section 402(a) may be promoted without denying railroads payment for service costs that are not easily divisible into incremental and non-incremental portions.[12]

■ The Commission's decision to join Amtrak to the terms of the 1907 Agreement falls within this limited category. On the record before it, the Commission would face an extremely difficult, if not impossible, task of separating non-incremental from incremental service costs. According to WTC, about sixty percent of costs are attributable directly to user railroads. Amtrak's direct costs are all incremental because the direct services charged would not be performed but for the operation of

Amtrak trains. Direct costs include labor and material expenses associated with the maintenance of Amtrak equipment, and cleaning and inspection of Amtrak cars.[13]

About forty percent of WTC costs are allocated to railroad users on the basis of terminal use because, WTC asserts, they "cannot be directly associated with individual users."[14] Such common costs include both property costs and some service costs. These service charges allocated to Amtrak on the basis of usage may contain charges for some non-incremental costs. Without Amtrak's operations, which account for at least eighty-five percent of the terminal's use, some common services might not be provided. Alternatively, the cost of services provided in Amtrak's absence might be less than or equal to the percentage of these common service costs currently paid for by other user railroads. In either event, Amtrak's allocated portion of these common costs would not exceed its incremental costs.

The Commission was unable to estimate the amount of Amtrak's actual incremental costs for two reasons. First, isolating the incremental portion of services that provide a common benefit to many users is inherently difficult.[15] Second, and more importantly, Amtrak exacerbated the difficulty of the task by failing to distinguish between incremental and non-incremental

---

**10.** In 1978, section 402(a) was amended to include costs of tracks and facilities within the third sentence of section 402(a), which imposes the incremental cost requirement. *See* section 15, Amtrak Improvement Act of 1978 (1978 Act), Pub.L. No. 95–421, 92 Stat. 923, 45 U.S. C.A. § 562(a) (1978). Pursuant to congressional intent, however, the 1978 Act will be applied prospectively. *National Railroad Passenger Corp. v. ICC,* —— U.S.App.D.C. at ——, 610 F.2d at 873, (D.C.Cir. 1979). Therefore, section 402(a) as set forth in 45 U.S.C. § 562(a) (1976) and as interpreted by this court in *National Railroad Passenger Corp. v. ICC,* 197 U.S.App. D.C. at ——, 610 F.2d at 875, applies to the case at bar.

**11.** Incremental costs are costs to the supplier railroad that, in the short run, would not accrue but for the existence of Amtrak operations.

**12.** Because the 1978 Act expands the category of costs to which the incremental cost limita-

tion must apply, *see* note 10 *supra,* we intimate no view on whether the Commission's justifiable inability to delineate incremental service costs on the record before it in this case would also arise if the Commission had been forced to distinguish between incremental and non-incremental property costs.

**13.** Amtrak & Washington Terminal Company, Use of Tracks & Facilities & Establishing Just Compensation, (*WTC I*), 348 I.C.C. 86, 96 (1975).

**14.** *Id.*

**15.** The cost of track and roadbed maintenance is one example of a common service cost that cannot be easily estimated without adequate data. *See National Railroad Passenger Corp. v. ICC,* 197 U.S.App.D.C. at —— —— ——, 610 F.2d at 880 881.

common service costs.[16] Thus, the Commission justifiably was unable to make a more precise delineation of service costs than that contained in the 1907 Agreement.

The Commission's decision, even without the adoption of performance quality standards, will not require Amtrak to pay for poor quality services.[17] Amtrak's new position, as half owner of the WTC station and maintenance yard, and full owner of the Virginia Avenue connection, entitles it to four of eight positions on the Board of Directors and one seat on the Board of Managers, composed of a representative from each user railroad. Amtrak may also select half of the officers of WTC.[18] The Commission also stated that "[i]f after a period of 6 months Amtrak finds itself unable to obtain satisfactory performance from terminal company employees, we will consider a renewed request for imposition of performance standards. . . ."[19] Amtrak's actual control over WTC, combined with the Commission's assurance to implement performance quality standards if necessary, convinces us that Amtrak will not suffer detriment by participation in the 1907 Agreement.

### III

Section 402(a) commands that the Commission set "just and reasonable compensation" for Amtrak's use of a supplier railroad's services, tracks, and facilities. In construing what is "just and reasonable,"

we are conscious of the structure by which section 402(a) dispatches Amtrak compensation disputes to the Commission. Commission involvement in Amtrak-railroad compensation agreements is not mandatory; it is simply available should Amtrak and a railroad fail to agree on the appropriate payments for the railroad's supply of services, track, and facilities to Amtrak. The Commission is statutorily required to set compensation charges within ninety days, and acts essentially as an arbitrator assessing conflicting claims. Consequently, we will uphold a Commission decision which is a reasonable accommodation of conflicting claims.[20]

■ Amtrak attacks the reasonableness of its assessed charges under the 1907 Agreement on two main grounds.[21] First, Amtrak disputes the Commission's treatment of common operating costs traceable to the Visitor Center. Second, Amtrak challenges the Commission's final decision not to include business cars in the formula used for allocating common costs. We find each decision to be just and reasonable under section 402(a) as applied in this case.

The Commission recognized in its 1975 decision that Amtrak's costs should be adjusted to reflect the fact that WTC was "quasi-excessing," see note 6 supra, the old terminal to the United States for renovation into the Visitor Center and constructing a new station adjacent to that Center.[22]

---

16. Amtrak presented the Commission with a suggested plan for allocation of common costs and recognized the difficulty of determining nonavoidable costs. WTC I, 348 I.C.C. at 92–93.

17. We noted in National Railroad Passenger Corp. v. ICC, 197 U.S.App.D.C. at ——, 610 F.2d at 880, that "payment of non-incremental service costs must not obviously harm Amtrak by forcing it to pay for the type of poor service" that provoked passage of the "incremental costs" provision of section 402(a).

18. See Supplemental Statement of B & O and C & O, J.A. at 594–95; Supplemental Statement of Amtrak, J.A. at 605–07. See also WTC II, 348 I.C.C. at 868–69.

19. WTC II, 348 I.C.C. at 871.

20. See National Railroad Passenger Corp. v. ICC, 197 U.S.App.D.C. at ——, ——, 610 F.2d at 875, 879.

21. Amtrak also attacks the Commission's refusal to impose performance standards on WTC operations. Although the Commission agreed to reconsider its position if Amtrak presented actual evidence of poor service, it declined to order performance standards for Amtrak's benefit governing a terminal owned one-half by Amtrak. The Commission's desire to avoid a situation in which Amtrak might be forced to pay penalties for poor service provided to Amtrak is eminently sound.

22. In 1968 Congress provided for the conversion of the Union Station building into a National Visitor Center and construction of a new station north of the Visitor Center. See Na-

Specifically, the Commission ordered the removal of space occupied by the Visitor Center from the rental base, and the retroactive exclusion from Amtrak payments of costs related to the Visitor Center.[23] The Commission applied its "quasi-excessing" decision retroactively to cover Amtrak's obligations since July 1, 1973.[24] In 1977, the Commission repeated its conclusion that Amtrak should not pay ownership expenses [25] or rent for space occupied by the Visitor Center, nor should it pay for costs directly attributable to the Visitor Center. At the same time, the Commission allowed WTC to charge Amtrak a portion of remaining operating costs.[26] Given the Commission's attempt to separate service and property costs attributable to the Visitor Center and its willingness to allow Amtrak to verify the cost accounting for the Visitor Center, we will not overturn the Commission's decision because of the possibility that some costs related to the Visitor Center may be included among WTC's general operating expenses.[27]

Amtrak also attacks the Commission's reversal in 1977 of its 1975 determination that business cars be included in the car counts used to allocate common costs. As we have noted previously, common costs are allocated among user railroads depending upon usage. Usage is calculated on the basis of the number of a railroad's cars passing through the facility. The 1907 Agreement, however, excluded business cars from consideration.[28] The 1977 Order reversing the 1975 decision was based upon this provision in the 1907 Agreement.[29] Because Southern holds a contractual right to have business cars excluded from the car count, the resulting difference between Southern's payment and Amtrak's obligation would be borne solely by B & O, the co-owner of the WTC. The 1977 Order simply allows the issue of exclusion of business cars to be settled by the terminal users themselves. Amtrak suffers no harm when it is forced to deal on the same basis as the other users of the terminal.[30]

---

23. tional Visitor Center Facilities Act of 1968, Pub.L. No. 90–264, 82 Stat. 43.

23. *WTC I*, 348 I.C.C. at 103.

24. *Id.* at 108.

25. Ownership expenses include depreciation, property taxes, interest, and property expenses. *WTC II*, 348 I.C.C. at 867.

26. *Id.*

27. In its petition for review, Amtrak also charges that 1971 amendments to the 1907 Agreement provide for the accounting of the Visitor Center transaction in a manner contrary to Commission accounting regulations and court precedent. By failing to raise this contention prior to final agency action, Amtrak deprived the Commission of an opportunity to consider these claims, thus controverting the principle that challenges to administrative action must be limited to points made by petitioners in agency proceedings. *Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 486 F.2d 375, 394 (D.C.Cir. 1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). A party must exhaust his administrative remedies before a federal court will consider his challenge to agency action. *See Nader v. NRC,* 168 U.S.App.D.C. 255, 264–65, 513 F.2d 1045, 1054–55 (D.C.Cir. 1975); *Spanish Int'l Broadcasting Co. v. FCC,* 128 U.S.App. D.C. 93, 102–03, 385 F.2d 615, 624–25 (D.C.Cir.

1967). Accordingly, we will not consider this challenge to the Commission's decision.

28. *See* J.A. at 198–99.

29. *WTC II,* 348 I.C.C. at 868.

30. Amtrak also charges that its right to due process was violated by procedures used by the Commission in reaching its section 402(a) determination. Specifically, Amtrak attacks the Commission's failure to hold an evidentiary hearing, and its decision to order simultaneous filings in hopes of expediting a decision. In its 1975 Order, the Commission stated that an oral hearing would not serve a useful purpose. The Commission also noted Amtrak's motion to strike certain evidence contained in WTC's statement filed simultaneously with Amtrak's statement, and stated that it would give "appropriate weight to the objections raised" by Amtrak. *WTC I,* 348 I.C.C. at 88. In its 1977 Order, the Commission repeated its conclusion that an oral hearing was unnecessary and denied additional Amtrak motions to strike. *WTC II,* 348 I.C.C. at 860–61. Further, the Commission noted that evidence contained in one WTC reply to a motion to strike, to which Amtrak did not have an opportunity to object, duplicated evidence introduced earlier in the proceedings. *Id.* at 867. The willingness of the Commission to consider Amtrak's pleadings objecting to evidence introduced by WTC, and

## IV

For the foregoing reasons, the decision of the Commission is

*Affirmed.*

the lack of any statutory requirement that an evidentiary hearing must be held, obviate any concern that Amtrak was denied "a reasonable opportunity to know the claims of the opposing party and to meet them." *Morgan v. United States*, 304 U.S. 1, 18, 58 S.Ct. 773, 82 L.Ed. 1129 (1938).