610 F.2d 865
 197 U.S.App.D.C. 346
 NATIONAL RAILROAD PASSENGER CORPORATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Missouri Pacfic Railroad Company, Office of Rail Public
Counsel, Intervenors.
NATIONAL RAILROAD PASSENGER CORPORATION, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Terminal Railroad Association of St. Louis (TRRA), & Office
of Rail Public Counsel, Intervenors.
 Nos. 77-1596, 77-1626.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 4, 1979.
Decided July 16, 1979.
 
 Robert B. Patterson, Washington, D. C., with whom Donald G. Avery, Cincinnati, Ohio, was on the brief, for petitioner.
 
 
 1
 Robert L. Thompson, Atty., Dept. of Justice, Washington, D. C., with whom Barry Grossman, Chief, Antitrust Division, Dept. of Justice, Washington, D. C., was on the brief, for respondent United States.
 
 
 2
 Henri F. Rush, Associate Gen. Counsel, I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, and Alan J. Thiemann, Atty., I. C. C., Washington, D. C., were on the brief, for respondent I. C. C.
 
 
 3
 Patrick C. Mullen, Chicago, Ill., a member of the bar of the Supreme Court of Illinois, Pro hac vice, by special leave of court, with whom Robert E. Simpson was on the brief, for intervenor Missouri Pacific Railroad Co.
 
 
 4
 Barry E. Cohen, Washington, D. C., for intervenor Terminal Railroad Association of St. Louis.
 
 
 5
 Howard A. Heffron, Washington, D. C., and Ralph S. Spritzer, Philadelphia, Pa., were on the brief for intervenor Office of Rail Public Counsel.
 
 
 6
 Robert B. Nicholson and Edward E. Lawson, Jr., Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondent United States.
 
 
 7
 Before McGOWAN and TAMM, Circuit Judges, and HOWARD F. CORCORAN,* Senior District Judge for the District of Columbia.
 
 
 8
 Opinion for the court filed by Circuit Judge TAMM.
 
 TAMM, Circuit Judge:
 
 9
 In these consolidated cases, the National Railroad Passenger Corporation (Corporation or Amtrak) petitions for review of two Interstate Commerce Commission (Commission) orders setting "just and reasonable compensation" for Amtrak's use of railroad services, tracks, and facilities. See 45 U.S.C. § 562(a) (1976). In the first case, No. 77-1596, we review the Commission's compensation schedule for Texas and Pacific Railway Company's (Texas and Pacific) operation of an Amtrak train, the Inter-American, between Fort Worth, Texas and Texarkana, Arkansas.[1] In the second case, No. 77-1626, we review the Commission's assessment of payments due the Terminal Railroad Association of St. Louis for Amtrak's use of its St. Louis railroad terminal and adjoining tracks.
 
 
 10
 * As an initial matter, we are called upon to interpret section 10(1) of the Amtrak Improvement Act of 1973 (1973 Act), Pub.L. No. 93-146, 87 Stat. 548, 45 U.S.C. § 562(a) (1976) (current version at 45 U.S.C.A. § 562(a) (1978)), which commands that the Commission "(i)n fixing just and reasonable compensation for the provision of services (to Amtrak by other railroads) shall, in fixing compensation in excess of incremental costs, consider quality of service as a major factor in determining the amount (if any) of such compensation." The question presented is whether this quality of service factor applies to the supplier railroad's recovery of non-incremental costs for Amtrak's use of tracks and facilities, as well as to the supplier railroad's recovery of non-incremental costs related to the provision of services.
 
 
 11
 Incremental costs are costs that the supplier railroad would avoid if passenger service were discontinued. Non-incremental costs would remain even if Amtrak service were halted. Both parties agree that supplier railroads should recover the incremental costs of running Amtrak trains. The Commission argues that a supplier railroad may charge Amtrak its share of non-incremental property costs regardless of the quality of service, but that non-incremental service costs are recoverable only if the supplier railroad meets certain quality criteria. Amtrak, on the other hand, rejects this distinction between costs for services provided and costs for use of tracks and facilities. It claims that quality of service criteria limit payment of non-incremental service and property costs.
 
 
 12
 Although the vitality of the debate has been dissipated by a 1978 amendment to the 1973 Act[2] that, as applicable to future cases, adopts the Amtrak position, the case before us must be decided on the basis of the 1973 Act. See text at ---- of --- U.S.App.D.C., at 873 of 610 F.2d, Supra. Upon consideration of relatively clear statutory language, ambiguous legislative history behind the 1973 Act, and interpretations rendered by both the Commission and a subsequent Congress, we hold that the term "services" as employed by the 1973 Act does not include costs associated with Amtrak's "use of tracks and facilities," See section 15, Amtrak Improvement Act of 1978 (1978 Act), Pub.L. No. 95-421, 92 Stat. 923, 45 U.S.C.A. § 562(a) (1978), and compensation for property costs is not limited by quality criteria.
 
 
 13
 * Congress enacted the Rail Passenger Service Act of 1970 (1970 Act), Pub.L. No. 91-518, 84 Stat. 1327 (current version in scattered sections of ch. 14, 45 U.S.C.A. (1978)), to preserve rail passenger service in the United States. Specifically, the 1970 Act created the National Railroad Passenger Corporation, a quasi-public corporation authorized to maintain inter-city railroad passenger service. Congress also appropriated $340 million in federal financial assistance to the Corporation.[3] The 1970 Act authorized the Corporation to assume by contract the inter-city rail passenger service obligations of railroads who wished to be relieved of their obligations as common carriers of passengers by rail. In consideration for the agreement, these "contracting" railroads, See text at ---- of 197 U.S.App.D.C., at 878 of 610 F.2d, Infra, paid to Amtrak the money they saved by relinquishing deficit-ridden passenger service.[4]
 
 
 14
 Section 402(a) of the 1970 Act, 45 U.S.C. § 562(a) (1976), provided the Corporation with two means to utilize the resources of railroads in furtherance of the Corporation's duties. Section 402(a) allowed the Corporation and a railroad to agree on a price for the Corporation's "use of tracks and other facilities and the provision of services." If the Corporation and Amtrak could not agree, the 1970 Act provided that the Commission could "order the provision of services or the use of tracks or facilities of the railroad by the Corporation, on such terms and for such compensation as the Commission may fix as just and reasonable."[5]
 
 
 15
 In order to guide the Commission's determination of the proper costs to be assumed by the Corporation, Congress in 1973 amended 45 U.S.C. § 562(a). Section 10(1) provides that: "In fixing just and reasonable compensation for the provision of services ordered by the Commission (under section 402), the Commission shall, in fixing compensation in excess of incremental costs, consider quality of service as a major factor in determining the amount (if any) of such compensation." The sentence added in 1973 refers explicitly only to "the provision of services," whereas the 1970 Act referred three times in the preceding two sentences to "the use of tracks and other facilities and the provision of services."[6] This shift in language provides the basis for the Commission's contention that the 1973 Act demands the use of quality criteria only to affect the payment of non-incremental service costs.
 
 
 16
 The statutory language of the 1973 Act, on its face, appears to support the Commission by speaking solely to one of two possible types of cost previously recognized by the statute. The plain language, however, does not conclusively resolve the Commission's contention, for even the most basic principle of statutory construction must yield to clear evidence of contrary legislative intent. Reporters Committee for Freedom of the Press v. Sampson, 192 U.S.App.D.C. 335, 339, 591 F.2d 944, 948 (D.C.Cir. 1978); See Harrison v. Northern Trust Co., 317 U.S. 476, 479, 63 S.Ct. 361, 87 L.Ed. 407 (1943). Accordingly, we examine the legislative history for evidence of clear congressional intent that the term "services" in section 10(1) of the 1973 Act should be defined more expansively than the term "services" as used in section 402(a) of the 1970 Act. In construing the provision, we are mindful of the deference due an administrative agency's reasonable interpretation of a statute controlling its activities. See Train v. Natural Resources Defense Council, 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); ASARCO Inc. v. EPA, 188 U.S.App.D.C. 77, 83-84, 578 F.2d 319, 325-26 (D.C.Cir. 1978).
 
 B
 
 17
 As noted previously, Congress enacted the original version of 45 U.S.C. § 562(a) as part of the 1970 Act which created the National Railroad Passenger Corporation. The 1970 Act mandated only that Amtrak pay supplier railroads a "just and reasonable" rate. This standard was not unique. Section 3(5) of the Interstate Commerce Act, 49 U.S.C. § 3(5) (repealed by Act of Oct. 17, 1978, Pub.L. No. 95-473, 92 Stat. 1466), for example, stated that the Commission shall set a "just and reasonable" rate to be paid by one railroad to another railroad for use of terminal facilities. The Commission interpretation of "just and reasonable" in that context did not limit the supplier railroad's recovery to incremental costs. Seaboard Air Line Railroad, 327 I.C.C. 1, 9 (1965); Missouri-Kansas-Texas Railroad v. Kansas City Terminal Railway, 198 I.C.C. 4, 9-11 (1933).[7] Similarly, the "just and reasonable" standard set forth in the 1970 Act did not base compensation upon the computation of incremental costs for the provision of services and the use of track and facilities. "Just and reasonable" compensation could be computed without distinguishing between incremental and non-incremental costs.[8]
 
 
 18
 Incremental and non-incremental costs were first differentiated in the 1973 Act.[9] The language of section 10(1) commands that the Commission "in fixing just and reasonable compensation for the provisions of services . . . consider quality of service as a major factor in determining the amount (if any) of such compensation," originated in H.R. 8351, a bill subsequently enacted as section 10(1) of the 1973 Act.[10] The House Committee on Interstate and Foreign Commerce, which sent H.R. 8351 to the full House, explained the purpose of the proposed language:
 
 
 19
 Section 402(a) of the Rail Passenger Service Act of 1970, as amended, presently provides for AMTRAK to pay to a railroad, for services performed by it or for the use of its properties and facilities, such compensation as the Interstate Commerce Commission "may fix as just and reasonable." While the Commission, in fixing such compensation, may consider the quality of service rendered by the railroad, there is no present statutory requirement that the Commission do so nor is there any indication of the weight Congress intended to be given the quality of service.
 
 
 20
 The committee's amendment of section 402(a) is intended to provide the following: (1) a floor for the compensation to be paid a railroad for services performed; and (2) a recognition that the higher the quality of service, the greater the compensation to be received.
 
 
 21
 H.Rep. No. 93-415, 93d Cong., 1st Sess. at 11 (1973).
 
 
 22
 Although the language of the House Report distinguishes between services performed and use of properties, congressional debate was not always as precise. During the debate preceding initial House passage of the amendment, Congressman Harvey referred to "quality of service" without expressly distinguishing use of tracks and other facilities from services performed. 119 Cong.Rec. 28746 (1973).
 
 
 23
 The Conference Committee, which met to resolve differences between the House and Senate versions of the 1973 Act, adopted the language of H.R. 8351. The Committee's explanation of the section is ambiguous: "The term 'incremental' is to be considered then as meaning those costs which would not be incurred if a particular service were not rendered or a given amount of traffic were not handled." H.Rep. No. 93-587, 93d Cong., 1st Sess. at 16 (1973). Although this definition refers specifically only to services, reference to "a given amount of traffic" is capable of broader construction.
 
 
 24
 Both the House and Senate referred again to section 10(1) of the 1973 Act during debate prior to adoption of the Conference Report. Representative Dingell repeated "that the railroads shall be paid above avoidable costs only on the basis of the quality of service afforded." 119 Cong.Rec. 34481 (1973). Senator Magnuson informed the Senate that "quality of service is to be the major determinant of any payments in excess of short-run avoidable costs." 119 Cong.Rec. 34591 (1973). As the previous excerpts demonstrate, congressional debate concerning the language of section 10(1) of the 1973 Act fails to indicate expressly that the term "services" was intended to be defined more expansively in the third sentence than in the first two sentences of section 402(a).
 
 
 25
 Amtrak also contends that legislative discussion of Penn Central Compensation for Passenger Service, 342 I.C.C. 820 (1973), demonstrates express congressional disapproval of the Commission's construction of the 1973 Act. Prior to the issuance of the Conference Report, the Commission ruled on the amount of compensation Amtrak owed the Penn Central railroad under the 1970 version of section 402(a). The Commission chose between three different compensation formulas:
 
 
 26
 Penn Central urges us to adopt as the "benchmark" of the compensation formu la promulgated herein the fully allocated cost of its intercity passenger operations. Amtrak urges us instead to adopt as the "benchmark" the avoidable cost of such intercity passenger operations. Full cost represents those costs, both solely related and a portion of the unattributable common, directly allocable to a particular service. Avoidable cost in the short run, hereinafter referred to as the incremental cost, represents that amount of maintenance of way, maintenance of equipment, and transportation expenses which could be saved if a particular service were eliminated. Avoidable cost in the long run, hereinafter referred to as the avertable cost, represents the variable and fixed costs directly traceable to the particular service, as well as the common costs which vary with the level of traffic attributable to that particular service. The avertable cost, therefore, may be defined as the operating expenses, rents, taxes, and rate of return on property directly allocable to the particular service. Fixed common expenses are not ordinarily included within the avertable cost, but where the justifiability of a particular service is significantly large relative to the justifiability of the entire system operation, the avertable cost will include the service's share of the common fixed cost as determined primarily and usually on the basis of original investment decision. Justifiability in an economic context reflects both the profitability of a particular service and the social benefit of that service.
 
 
 27
 Penn Central Compensation for Passenger Service, 342 I.C.C. at 831-32. The Commission adopted the more generous full cost approach to measure the base compensation due Penn Central for Amtrak operations along the Boston-Washington corridor, in which intercity passenger traffic constituted 40% Of total operations. The Commission employed the avertable cost standard for Penn Central operations conducted outside the Boston-Washington corridor, in which passenger travel accounted for a "minimal" portion of total operations. Id. at 833. Further, the Commission held that the "quality of services rendered" would affect Penn Central compensation for both corridor and non-corridor operations. Id. at 834.
 
 
 28
 The Commission's Penn Central decision was handed down on September 19, 1973. The Conference Report, issued a month later, explicitly criticized the Commission's determination that Penn Central "should receive additional compensation in excess of avoidable costs in the Boston-Washington Corridor." H.Rep. No. 93-587 at 16. The Conference Committee, noting Penn Central's poor record of performance, stated that "at present performance levels, the railroads are not entitled to the compensation base that could be established under the Commission's ruling." Id.
 
 
 29
 Discontent with the Penn Central decision was evident in both houses during the floor debates that preceded final enactment of the 1973 Act. In the House, Representative Dingell expressed the congressional intent to "vitiate that particular unwise action of the ICC." After Representative Dingell noted "that the quality of service afforded by Penn Central is uniquely poor," Representative Kuykendall denounced the Penn Central decision to allocate full cost to the Penn Central as "back-door financing to an outfit that, frankly, has disgraced the entire railroad industry." 119 Cong.Rec. 34481. In the Senate, Senator Magnuson expressed similar sentiments. "The conferees," he said, "made clear that payments in excess of short-run (avoidable) costs are to be based on quality of service." 119 Cong.Rec. 34591.
 
 
 30
 The 1973 Act thus legislatively reversed the Commission's decision that Penn Central should have received payments for the full cost, both incremental and non-incremental, of Amtrak operations in the Boston-Washington corridor. Instead, Congress mandated use of the term "incremental costs," which appears to coincide with the Commission's definition: "Avoidable cost in the short run, hereinafter referred to as the incremental cost, represents that amount of maintenance of way, maintenance of equipment, and transportation ex penses which could be saved if a particular service were eliminated." Penn Central, 342 I.C.C. at 832. Amtrak contends that the decision to overrule Penn Central indicates that Congress wanted all non-incremental costs, both service and property, to be governed by quality of service criteria. Congress, having set the "just and reasonable" standard for the computation of compensation generally, might have wanted only non-incremental service costs to be governed by quality of service criteria. Since either interpretation overrules the decision in Penn Central that all non-incremental costs should be included in the base compensation, we conclude that this portion of the legislative history of the 1973 Act is not conclusive.
 
 
 31
 In sum, the legislative history of section 402(a) prior to enactment of the 1978 amendments[11] contains congressional statements that fail to limit expressly the import of the 1973 amendment to services, but reveals no explicit statement that the distinction between provision of services and use of track found in the 1970 Act was to be disregarded in construing section 10(1) of the 1973 Act. Moreover, the avowed congressional intent behind the 1973 Act to override the Commission's decision in Penn Central to use a full costs standard is carried out no matter which reading of the 1973 Act governs.
 
 C
 
 32
 Section 15 of the 1978 Act, Pub.L. No. 95-421, 92 Stat. 923, 45 U.S.C.A. § 562(a) (1978), added the phrase "or for the use of tracks and facilities" to the language of section 402(a). The statute now reads, in part: "In fixing just and reasonable compensation for the provision of services or for the use of tracks and facilities ordered by the Commission under the preceding sentence, the Commission shall, in fixing compensation in excess of incremental costs, consider quality of service as a major factor in determining the amount (if any) of such compensation." If the 1978 Act applied to this case, Amtrak would prevail. Our obligation to apply the law in effect at the time of our decision does not apply, however, if Congress expressly intended the previous statute to govern. Bradley v. School Board of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); Potomac Electric Power Co. v. United States, 190 U.S.App.D.C. 77, 85, 584 F.2d 1058, 1066 (D.C.Cir. 1978). Because the Conference Report on the 1978 Act clearly instructs "the courts to give this amendment (to section 402(a)) prospective application only,"[12] we are left with the task of interpreting the 1973 Act.
 
 
 33
 The legislative history of the 1978 Act, although not dispositive, may guide our interpretation of the term "services" as employed in the 1973 Act. As we have noted recently:
 
 
 34
 (I)t is a well established principle that courts may look to subsequent legislation as an aid in the interpretation of prior legislation dealing with the same or similar subject matter. Indeed, Chief Justice Marshall stated the principle that, if it can be gathered from a subsequent statute In pari materia what meaning the legislature attached to the words of a former statute, this will amount to a legislative declaration of its meaning, and will govern the construction of the first statute.[13]
 
 
 35
 Jordan v. Department of Justice, 192 U.S.App.D.C. 144, 161, 591 F.2d 753, 770 (D.C.Cir. 1978) (en banc) (footnotes omitted); See Erlenbaugh v. United States, 409 U.S. 239, 243-44, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972). Section 15 of the 1978 Act is In pari materia with section 10(1) of the 1973 Act.
 
 
 36
 The legislative history of the 1978 Act demonstrates that the addition of the phrase "or for the use of tracks and facilities" constitutes a change from the previous law. The congressional decision to give the amendment only prospective application reinforces the conclusion that Congress believed the 1978 Act restructured the compensation formula set forth in section 402(a). The Conference Committee stated that the additional language
 
 
 37
 amends section 402(a) of the Rail Passenger Service Act by directing the ICC, in fixing "just and reasonable" compensation, to include tracks and facilities under the incremental cost concept. The conference substitute changes the law to permit incentives for good quality track and facilities. The conferees do not intend to affect any existing contracts between railroads and Amtrak. Neither do the conferees intend for incentive payments to be made only for improvement in track and facilities. Incremental costs now become the threshold for determining "just and reasonable" compensation should the Commission have to resolve the matter. Furthermore, the conferees expect the Commission and the courts to give this amendment prospective application only.
 
 
 38
 H.Rep. No. 95-1478, 95th Cong., 2d Sess. at 20 (1978), U.S.Code Cong. & Admin.News 1978, p. 2341. Before adoption of the 1978 Act, Representative Skubitz stated that the "conferees did not want to interfere with the adjudication of the Texas and Pacific case" and reiterated that the amendment altered the pre-existing law. 124 Cong.Rec.H10133 (daily ed. September 19, 1978).[14]
 
 
 39
 Congress has stated its view of the meaning of the 1973 Act. The addition of the phrase "or for the use of tracks and facilities" in itself implies that Congress, alert to the dichotomy between provision of services and use of tracks enunciated in the opening sentences of section 402(a), enlarged the "incremental cost" sentence to include use of track and facilities. This impression is heightened by the Conference Committee's declaration that the 1978 amendment changed the law, and by the clear congressional intent to apply the 1978 amendment prospectively to avoid interference with the adjudication of this case. Congressional silence would have compelled the application of the 1978 Act in this case, but Congress's express alteration of the normal effect of legislative action on pending litigation cannot be ignored.
 
 
 40
 We hold that, for the purposes of the statutory standard applicable to the allowance by the Commission of compensation for non-incremental costs, the term "services" in the 1973 Act was not meant to include tracks and other facilities. Although legislative history prior to the 1978 Act is ambiguous, the combination of the plain language of the statute, which appears to contemplate a distinction between provision of services and use of tracks, the Commission's interpretation of the Act, to which we accord some deference, and the obvious congressional intent underlying adoption of the 1978 Act, which is In pari materia with the 1973 Act, conclusively solves the issue of statutory interpretation.
 
 II
 
 41
 We turn now to the application of section 402(a) in these consolidated cases. We begin with Amtrak and The Texas & Pacific Railway Use of Tracks and Facilities and Establishment of Just Compensation (Texas & Pacific), 348 I.C.C. 645 (1976), in which Amtrak, unable to agree with a supplier railroad, petitioned the Commission under section 402(a) to fix "just and reasonable" rates for the provision of services or the use of track and facilities.
 
 
 42
 Section 402(a) does not, in the ordinary course of events, require Commission approval of every Amtrak-railroad contract. Rather, the Commission's role is to arbitrate an unresolved dispute between two negotiating parties. The Commission, guided by the language of section 402(a), has broad discretion to choose an appropriate level of compensation. Recognizing the Commission's role pursuant to section 402(a) as settlor of disputes between intransigent parties, we will sustain a Commission's order under section 402(a) if its decision is a rational accommodation of opposing interests.
 
 
 43
 In Texas & Pacific, Amtrak requested the Commission to set the compensation terms for the operation by the Texas and Pacific Railway Company (Texas and Pacific) of Amtrak's train, the Inter-American, which travels thrice weekly between Texarkana, Arkansas and Fort Worth, Texas. The Commission's decision covers the payments due from March 12, 1975 to May 1, 1978.[15]
 
 
 44
 The Commission's methodology was as follows: It divided costs related to provision of services into incremental and non-incremental costs. Incremental service costs were automatically recoverable by the railroad. Non-incremental service costs could be recovered only if the railroad met certain quality of service standards. As noted previously, See text at ---- of 197 U.S.App.D.C., at 872 of 610 F.2d, Supra, incremental costs are avoidable costs costs that would not be incurred if no passenger service were performed for Amtrak. See H.Rep. No. 93-415 at 11 (1973); H.Rep. No. 93-587 at 16 (1973). The Commission determined property costs by setting charges for the use of tracks and facilities pursuant to the "just and reasonable" standard. It did not distinguish incremental from non-incremental property costs. Finally, the Commission created quality of service standards which governed Amtrak's payment of non-incremental service costs.[16]
 
 
 45
 The Commission calculated cost figures for twelve service and property factors,[17] then determined the quality of service criteria. The quality of service criteria was primarily the on-time performance standard. As the Commission noted, "the only feasible service standard would appear to be one defined in terms of on-time performance, (as) a slack schedule would make high on-time performance readily obtainable without any improvement in the railroad's performance."[18] The Commission considered the applicable speed limits, the high volume of freight traffic between Texarkana and Fort Worth, and the limited number of sidings available along the route and established a running time of 345 minutes as the on-time baseline figure to be used in measuring quality of performance. Id. at 671.[19]
 
 
 46
 In order to guarantee Texas and Pacific its out-of-pocket expenses and to encourage superior performance, the Commission adopted the following quality of service standard:
 
 
 47
 (1) T & P shall receive its incremental costs (as determined herein including the specified adjustments) as the minimum monthly compensation;
 
 
 48
 (2) the minimum on-time performance level baseline shall be 80 percent;[20]
 
 
 49
 (3) if the baseline is met or exceeded in a given month, T & P shall, in addition to incremental costs, receive its allocated common costs, i. e., train movement service expense and supervision, as determined herein including the specified adjustments;
 
 
 50
 (4) for each one percent of on-time performance exceeding the said baseline in a given month, T & P shall, in addition to the aforesaid compensation, receive 1 percent of the incremental costs and allocated common costs, determined as aforesaid (this bonus amount should be flat rated by the parties according to their best estimates);
 
 
 51
 (5) for recovered time on late-delivered trains, T & P shall receive $0.15 per passenger minute, limited to the number of minutes the train was received late at origin;
 
 
 52
 (6) for lost time on late-delivered trains, Amtrak may subtract $0.15 per passenger minute from any bonus owed under the preceding provision (a train loses time when the trip time between Texarkana and Fort Worth exceeds scheduled time by more than 10 minutes);
 
 
 53
 (7) for purposes of provision (2) herein, a train shall be considered "on time" if it completes the entire run between Texarkana and Fort Worth (including necessary station time) within the scheduled time plus 10 minutes.
 
 
 54
 (8) notwithstanding provision (7), late performance shall be excusable when hindered by Force majeure such as strikes, riots, floods, accidents, acts of God, et cetera, provided that T & P document any claim of delay due to causes beyond its control, with delay becoming chargeable when the cause thereof returns to T & P's control; and
 
 
 55
 (9) pending implementation of the schedule reduction to (345) minutes running time previously discussed in this report, the minimum on-time performance level established herein shall apply to existing schedules, provided that the said schedule reduction be put into effect in timely fashion.[21]
 
 
 56
 Under the provisions of the performance standard, Texas and Pacific would be reimbursed completely for the incremental costs of Amtrak service and receive non-incremental costs if it met or exceeded the on-time performance standard 80% Of the time each month.
 
 
 57
 We now reach Amtrak's remaining major objections to the Texas & Pacific decision. First, Amtrak contends that a Force majeure clause governing Texas and Pacific's performance standards is unreasonable and contradicts Commission precedent. Second, Amtrak argues that specific cost figures calculated by the Commission are unsupportable.
 
 
 58
 Use of a Force majeure provision in conjunction with the 80% Minimum service standard, Amtrak argues, allows Texas and Pacific to receive incentive payments for poor service in contravention of congressional intent. Amtrak has failed, however, to demonstrate that Texas and Pacific service has been, or will be, inadequate. Although Amtrak did suggest a running time for the Inter-American shorter than the running time selected by the Commission,[22] Amtrak has not shown that the Commission's choice of an on-time performance standard was unreasonable. See note 19 and accompanying text Supra.
 
 
 59
 Amtrak also contends that the use of a Force majeure provision directly contradicts previous Commission precedent. If the Commission has, as Amtrak charges, inexplicitly ignored its own precedent, then the Commission's decision cannot stand. As this court has stated on numerous occasions, an administrative agency must not abandon its past principles without reasoned analy sis. See Road Sprinkler Fitters Local Union No. 669 v. NLRB, 195 U.S.App.D.C. 104, 109, 600 F.2d 918, 923 (D.C.Cir. 1979); Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. 175, 183, 454 F.2d 1018, 1026 (D.C.Cir. 1971).
 
 
 60
 In a similar section 402(a) case involving Amtrak and the Union Pacific Railroad, the Commission adopted an 80% On-time performance standard. The Commission rejected Union Pacific's request for the inclusion of a Force majeure provision:
 
 
 61
 We do not agree with Union Pacific that late performance should be excused when such results from acts of God. The 80-percent baseline level in itself recognizes and makes allowance for occasions on which on-time performance is not possible. In addition, we believe that such condition would lead to disputes as to the cause of late performance and the categorization of such cause. Union Pacific shall be excused for late performance where the train is delayed due to specific instructions from Amtrak.
 
 
 62
 National Railroad Passenger Corp. & Union Pacific Railroad Use of Tracks & Facilities & Establishment of Just Compensation (Union Pacific), 348 I.C.C. 926, 951 (1977). In the present case, however, the Commission limited full compliance with an 80% On-time performance standard by adopting a clause that provides, "late performance shall be excusable when hindered by Force majeure such as strikes, riots, floods, acts of God, et cetera . . . ."[23]
 
 
 63
 The Commission defends this seeming inconsistency by distinguishing between contracting railroads, which were relieved of the burden of carrying passengers by the creation of Amtrak, and non-contracting railroads, which were not carrying passenger traffic when Amtrak was created, See text at ---- of 197 U.S.App.D.C., at 868 of 610 F.2d, Supra. The Commission argues that because non-contracting railroads, such as Texas and Pacific, are not relieved of any burdens by Amtrak, their rates may be higher than charges levied by contracting railroads, such as Union Pacific, which are indebted to Amtrak for takeover of their passenger service.[24]
 
 
 64
 The distinction does not justify the difference. A Force majeure provision governs the burden of costs that cannot be controlled by either party. In so doing, it places a financial burden on one party rather than another, but does not create greater performance incentives for contracting railroads than for non-contracting railroads. Nevertheless, use of the Force majeure provision may affect the ability of a railroad to meet its 80% On-time minimum performance standard. If a Force majeure event occurs, a non-contracting railroad will be able to meet the performance standard more easily than a contracting railroad. For example, a Texas and Pacific train delayed by an act of God will not be included in determining compliance with the monthly performance standard. A similarly delayed Union Pacific train, however, would diminish that railroad's ability to meet the performance standard. Thus, it is possible that the Commission chose to adopt a Force majeure provision instead of employing a performance standard of less than 80% For the Texas and Pacific Railroad.
 
 
 65
 The Commission's decision does not, however, reveal this line of reasoning, and we will not review a ground not employed by the agency. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Further, we fail to see why the distinction would affect the commission's alternative rationale for rejecting use of a Force majeure clause in Union Pacific the parties' inability to adjudicate "disputes as to the cause of late performance and the categorization of such cause."[25] Accordingly, we remand this portion of the Commission's decision for reconsideration and further explanation.
 
 
 66
 Finally, Amtrak attacks the Commission's computation of specific service costs by suggesting that the choice of a formula used to compute track and roadbed maintenance charges is inconsistent with that used in the Union Pacific case. See Union Pacific, 348 I.C.C. at 946. In Union Pacific, the Commission employed the "Amtrak" formula, which multiplies the gross ton-miles of Amtrak service by an average calculated railroad maintenance-of-way cost per route-mile. In the Texas & Pacific Case, the Commission calculated a figure by multiplying the number of gross ton-miles of Amtrak service by Texas and Pacific's actual maintenance cost per gross ton-mile.[26] We believe the Commission adequately explained its rejection of the Amtrak proposal. The Commission, noting Texas and Pacific's contention that its maintenance costs were higher than average, employed actual maintenance costs incurred by Texas and Pacific in calculating the appropriate cost figure.[27] In the absence of any suggestion that Texas and Pacific's actual maintenance costs were unjustified, the Commission cannot be faulted for applying specific calculations instead of a general formula.
 
 
 67
 We have examined Amtrak's other objections to the Commission's computation of service costs and find them similarly without merit. It bears repeating that the Commission, when called upon to fix compensation pursuant to section 402(a), acts in a significantly different capacity than when called upon to regulate common carrier activity in the first instance. In this case, the Commission is not administering a pervasive system of regulation; rather, it is called upon to settle within ninety days a contractual dispute between two deadlocked parties. See 45 U.S.C.A. § 562(a) (1978).[28] In a situation in which the Commission must act as mediator, we do not find the Commission's decision unreasonable. Consequently, the remainder of the Commission's decision may be upheld as a reasonable accommodation between the parties' competing positions.[29]
 
 III
 
 68
 Finally, we review the Commission's decision in National Railroad Passenger Corp. & Terminal Railroad Association of St. Louis et al., Use of Tracks & Facilities & Establishment of Just Compensation (TRRA), 348 I.C.C. 901 (1977). Amtrak, under section 402(a), asked the Commission to order the Terminal Railroad Association of St. Louis (TRRA) to provide it with service, tracks, and facilities at the St. Louis Union Station in St. Louis, Missouri. Amtrak also requested the Commission to set compensation terms payable under section 402(a).
 
 
 69
 After the Commission determined the "just and reasonable" compensation for rental use of the station, it then utilized TRRA's multiple-zone system to measure Amtrak's obligation to pay for the use of track leading into the station.[30] The zone system divides the terminal area into sixty-one separate geographic "zones." Costs are allocated on the basis of a railroad's pattern of use in each zone. Amtrak operates railroads in nine of the sixty-one zones.
 
 
 70
 Amtrak argues that the Commission's decision violates section 402(a)'s "quality of service" limitation since the costs allocated by the zone system include both property costs (E. g., use of track) and service costs (E. g., track and roadbed maintenance). The Commission acknowledges that the zone system does not distinguish between incremental and non-incremental service costs attendant to the use of tracks. The Commission explains, however, that the distinction is difficult, if not impossible, to make in a situation in which many railroads use common facilities, and that Amtrak's only alternative was the suggestion that its use of the tracks and facilities was not compensable. As the Commission further noted, Amtrak explicitly recognized that "it is apparent that Amtrak's use requires the expenditures of some maintenance funds," while insisting that its use of tracks "creat(ed) no avoidable costs . . . ."[31]
 
 
 71
 Theoretically, the level of maintenance could be decreased if less trains used the track. Difficulties arise, however, in calculating the avoidable cost if only Amtrak traffic ceased. With the data before it, the Commission could only guess whether Amtrak's shorter and lighter passenger trains demanded a proportionately smaller percentage of maintenance funds than the longer and heavier freight cars, or whether passenger trains, which must provide a smoother ride than freight cars, demand a proportionately larger percentage of maintenance funds. The parties failed to introduce evidence to support either proposition. Accordingly, the Commission justifiably relied on the pre-existing zone system.
 
 
 72
 In cases arising under the 1973 Act, in which only non-incremental service costs must be coupled with quality standards, we hold that the Commission may levy against Amtrak the non-incremental and incremental cost of services without use of quality criteria if two conditions are met: (1) the Commission must have been unable to distinguish between incremental and non-incremental costs on the information supplied to it; and (2) payment of non-incremental service costs must not obviously harm Amtrak by forcing it to pay for the type of poor service that aroused congressional ire after the Penn Central decision. See text at ---- - ---- of --- U.S.App.D.C., at 872-873 of 610 F.2d, Supra.[32] A contrary holding might force the Commission to apply quality of service criteria to all service costs, even if it could not distinguish between incremental and non-incremental costs. If the Commission had followed this course, however, a railroad failing to meet quality of service criteria might not even receive its incremental costs. There is no legislative intent that would justify forcing a railroad to accommodate Amtrak operations without the recovery of at least its incremental costs. Moreover, we believe that our decision today properly places a burden on Amtrak, which is the beneficiary of the "quality of service" provision, to come forward with a proposal explaining how incremental and non-incremental common service costs may be distinguished.[33]
 
 
 73
 In the TRRA case, the Commission's decision to retain the zone system for the allocation of costs was just and reasonable. As noted above, Amtrak did not supply data tending to show what level of track and roadbed maintenance would be required if Amtrak trains did not use the St. Louis terminal. The absence of data was crucial for, as the Commission noted in a similar context,
 
 
 74
 (P)ast efforts to develop general formulas for estimating track and roadbed maintenance costs have not resulted in wide acceptance. This is primarily due to two factors: (1) the lack of sufficient emperical data from which to draw conclusions by statistical analysis; and (2) the absence of scientific theory from which to derive equations relating track (depreciation) to a myriad of independent variables which cause it.
 
 
 75
 TRRA, 348 I.C.C. at 919 n.29 (quoting Texas & Pacific, 348 I.C.C. at 661). Further, Amtrak had not contended that the service received from TRRA was inadequate in any respect. Under these circumstances, the Commission's decision must be affirmed.
 
 IV
 
 76
 For the foregoing reasons, the Commission's decision in No. 77-1596 is affirmed in part and remanded in part; and the Commission's decision in No. 77-1626 is affirmed.
 
 
 77
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(c)
 
 
 [1]
 Although the Texas and Pacific Railway Company (Texas and Pacific) has been merged with the Missouri Pacific Railroad Company, See Missouri Pac. R.R. Co. Merger Texas & P. Ry. Co. and Chicago & E. Ill. R.R. Co., 348 I.C.C. 414 (1976), we refer only to the Texas and Pacific Railway Company for the sake of convenience
 
 
 [2]
 See section 15, Amtrak Improvement Act of 1978 (1978 Act), Pub.L. No. 95-421, 92 Stat. 923, 45 U.S.C.A. § 562(a) (1978)
 
 
 [3]
 Congress, through the Rail Passenger Service Act of 1970 (1970 Act), Pub.L. No. 91-518, 84 Stat. 1327, appropriated $40 million in direct grants, See section 601 of the 1970 Act, 84 Stat. 1338 (current version at 45 U.S.C.A. § 601 (1978)); $100 million in federal loan guarantees, See section 602 of the 1970 Act, 84 Stat. 1338 (current version at 45 U.S.C.A. § 602 (1978)); and $200 million in emergency financial assistance for railroad passenger service, See section 701 of the 1970 Act, 84 Stat. 1339 (current version at 45 U.S.C.A. § 621 (1978)); section 702 of the 1970 Act (current version at 45 U.S.C. § 622 (1976))
 
 
 [4]
 Section 401 of the 1970 Act, 45 U.S.C. § 561 (1976)
 
 
 [5]
 Section 402(a) of the 1970 Act provided:
 The Corporation may contract with railroads or with regional transportation agencies for the use of tracks and other facilities and the provision of services on such terms and conditions as the parties may agree. In the event of a failure to agree, the Interstate Commerce Commission shall, if it finds that doing so is necessary to carry out the purposes of this Act, order the provision of services or the use of tracks or facilities of the railroad by the Corporation, on such terms and for such compensation as the Commission may fix as just and reasonable, and the rights of the Corporation to such services or to the use of tracks or facilities of the railroad or agency under such order or under an order issued under subsection (b) of this section shall be conditioned upon payment by the Corporation of the compensation fixed by the Commission. If the amount of compensation fixed is not duly and promptly paid, the railroad or agency entitled thereto may bring an action against the Corporation to recover the amount properly owed.
 
 
 [84]
 Stat. 1335 (1970)
 
 
 [6]
 Section 10(1) of the Amtrak Improvement Act of 1973 (1973 Act), Pub.L. No. 93-146, 87 Stat. 548, 45 U.S.C. § 562(a) (1976) (current version of 45 U.S.C.A. § 562(a) (1978)), amended section 402(a) to provide:
 The Corporation may contract with railroads or with regional transportation agencies for the use of tracks and other facilities and the provision of services on such terms and conditions as the parties may agree. In the event of a failure to agree, the Interstate Commerce Commission shall, within ninety days after application by the Corporation, if it finds that doing so is necessary to carry out the purposes of this chapter, order the provision of services or the use of tracks or facilities of the railroad by the Corporation, on such terms and for such compensation as the Commission may fix as just and reasonable, and the rights of the Corporation to such services or to the use of tracks or facilities of the railroad or agency under such order or under an order issued under subsection (b) of this section shall be conditioned upon payment by the Corporation of the compensation fixed by the Commission. In fixing just and reasonable compensation for the provision of services ordered by the Commission under the preceding sentence, the Commission shall, in fixing compensation in excess of incremental costs, consider quality of service as a major factor in determining the amount (if any) of such compensation. If the amount of compensation fixed is not duly and promptly paid, the railroad or agency entitled thereto may bring an action against the Corporation to recover the amount properly owed.
 (emphasis added to 1973 Act). See also note 9 Infra for text of intervening 1972 amendment.
 
 
 [7]
 See also section 4 of the Natural Gas Act, 15 U.S.C. § 717c(a) (1976) (requiring natural gas rates and charges to be "just and reasonable"); FPC v. Memphis Light, Gas & Water Div., 411 U.S. 458, 466, 93 S.Ct. 1723, 1728, 36 L.Ed.2d 426 (1973) (The standard set forth in section 4 contemplates "revenues sufficient to recover operating expenses and capital costs.")
 
 
 [8]
 Amtrak argues that the legislative history of a proposed Senate bill supports its position that the railroads may only be compensated for avoidable costs, both service and track, without resort to quality of service criteria. The Senate Commerce Committee originally reported out a bill that would subsidize railroad passenger service. The subsidies were not to exceed "avoidable costs, less revenues." S. 3706, 91st Cong., 2d Sess., § 202(a), S.Rep. No. 91-765 at 21. On the floor of the Senate, however, the proposed subsidy bill was replaced in its entirety by the bill to establish a nationwide railroad corporation, 116 Cong.Rec. 14160 (1970), that was later enacted, virtually without change, as the 1970 Act. 116 Cong.Rec. 36894 (1970). The new bill contained no mention of "avoidable costs." Absent clear legislative history to support Amtrak's contention that the framers of the 1970 Act explicitly embraced S. 3706's "avoidable cost" language, we decline the invitation to assume that the payment scheme designed to govern a subsidy program necessarily would govern the payments of a for-profit corporation. See section 301 of the 1970 Act, 45 U.S.C. § 541 (1976)
 
 
 [9]
 See note 6 Supra for text of section 10(1) of the 1973 Act. Congress passed a minor amendment to section 402(a), 45 U.S.C. § 562(a) (1976), in 1972 providing that
 (i)n the event of a failure to agree, the Interstate Commerce Commission shall, Within ninety days after application by the Corporation, if it finds that doing so is necessary to carry out the purposes of this chapter, order the provision of services or the use of tracks or facilities of the railroad by the Corporation, on such terms and for such compensation as the Commission may fix as just and reasonable, and the rights of the Corporation to such services or to the use of tracks or facilities of the railroad or agency under such order or under an order issued under subsection (b) of this section shall be conditioned upon payment by the Corporation of the compensation fixed by the Commission.
 (emphasis added to 1972 Act). See Act of June 22, 1972, Pub.L. No. 92-316 § 5(1), 86 Stat. 229.
 
 
 [10]
 Compare section 6, H.R. 8351, H.Rep. No. 93-415, 93d Cong., 1st Sess. at 3 (1973) ("In fixing just and reasonable compensation for the provision of services ordered by the Commission under the preceding sentence, the Commission shall in fixing compensation in excess of incremental costs, consider quality of service as a major factor in determining the amount (if any) of such compensation.") With section 10(1), 1973 Act, ("In fixing just and reasonable compensation for the provision of services ordered by the Commission under the preceding sentence, the Commission shall, in fixing compensation in excess of incremental costs, consider quality of service as a major factor in determining the amount (if any) of such compensation.")
 
 
 [11]
 In 1976, Congress amended section 402(a) to allow Amtrak and other railroads to enter into agreements allowing railroad use of Amtrak facilities:
 Notwithstanding any other provision of this Act, the Corporation may enter into agreements with any other railroads and with any State (or local or regional transportation agency) responsible for providing commuter rail or rail freight services over tracks, rights-of-way, and other facilities acquired by the Corporation pursuant to authority granted by the Regional Rail Reorganization Act of 1973 (45 U.S.C. 701 et seq.) and the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 801 et seq.). In the event of a failure to agree, the Commission shall order that rail services continue to be provided, and it shall, consistent with equitable and fair compensation principles, decide, within 180 days after the date of submission of a dispute to the Commission, the proper amount of compensation for the provision of such services. The Commission, in making such a determination, shall consider all relevant factors, and shall not permit cross subsidization among intercity, commuter, and rail freight services.
 Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94-210, Title VII, § 705(a), (h), 90 Stat. 31 (1976).
 
 
 [12]
 H.Rep. No. 95-1478, 95th Cong., 2d Sess. at 20 (1978), U.S.Code Cong. & Admin.News, 1978, p. 2341
 
 
 [13]
 Chief Justice Marshall wrote:
 (I)t is to be observed that acts In pari materia are to be construed together as forming one act. If, in a subsequent clause of the same act provisions, are introduced, which show the sense in which the legislature employed doubtful phrases previously used, that sense is to be adopted in construing those phrases. Consequently, if a subsequent act on the same subject affords complete demonstration of the legislative sense of its own language, the rule which has been stated, requiring that the subsequent should be incorporated into the foregoing act, is a direction to courts in expounding the provisions of the law.
 Alexander v. Alexandria, 5 Cranch 1, 7-8, 9 U.S. 1, 7-8, 3 L.Ed. 19 (1809) (Quoted in Jordan v. Department of Justice, 192 U.S.App.D.C. 144, 161 n. 65, 591 F.2d 753, 770 n. 65 (D.C.Cir. 1978) (en banc)).
 
 
 [14]
 Representative Staggers stated prior to adoption of the Conference Report that it "changes the law with respect to compensation paid to railroads by Amtrak for use of their tracks and facilities, using an incremental cost concept as a benchmark." 124 Cong.Rec. H10132 (daily ed. September 19, 1978)
 
 
 [15]
 See Brief for Intervenor Missouri Pacific Railroad Company at 4 n *
 
 
 [16]
 Texas & Pacific, 348 I.C.C. at 657-58
 
 
 [17]
 Appendix II of the Interstate Commerce Commission's (Commission) decision illustrates the various amounts proposed by the parties for the twelve cost categories adjudged by the Commission, as well as the Commission's decision. Each figure is for an average month's operation
 T & P Amtrak Commission
 Cost Category proposal proposal decision
-------------------------------------------------------------------------------
Direct costs:
 1 Train and engine crews ................ $17,084 $17,160 $17,084
 2 Meals and lodging ....................... 1,323 1,794 1,323
Direct costs--Continued
 3 Fuel .................................... 7,061 6,422 6,514
 4 Equipment maintenance, servicing,
 and inspection ......................... 639 278 450
 5 Station maintenance and utilities ......... 390 390 390
 6 Track and roadbed maintenance .......... 23,084 1,430 4,673
Common costs:
 7 Train movement service expense .......... 2,067 0 1 1,257
 8 Supervision ............................. 8,268 0 2 2,579
Property costs:
 9 Property taxes ............................ 550 0 500
 10 Station rent .............................. 400 0 100
 11 Return on investment .................... 6,495 0 2,273
Liability:
 12 Liability risk .............................. 0 237 473
 Total .............................. 67,361 27,711 37,666
------------------
1 Amtrak would obtain its own insurance directly.
2 T & P will receive payment for (allocated) common costs in any given month
 only if it delivers on-time performance at the rate of 80 percent or higher
 in that month.
NOTE: The figures shown are all based on 6,448 Amtrak train-miles per month and
 are adjustable proportionately to reflect any change.
 Id. at 677.
 
 
 [18]
 Id. at 669
 
 
 [19]
 The previous schedule had been 365 minutes. Amtrak proposed cutting the scheduled time by 64 minutes or, if the applicable speed limit were raised from 60 m.p.h. to 75 m.p.h., by 88 minutes. Id. at 647. Texas and Pacific defended the 365 minute schedule. Id. at 651. In reaching its decision to order a 20 minute shortening of the schedule, the Commission stated:
 While Amtrak has argued strongly for a greater shortening of the schedules, we are not convinced that T & P could consistently meet the 80 percent on-time performance baseline with such abbreviated schedules without adversely affecting its freight operations. In other words, we consider that under the circumstances presented a 20-minute (maximum) schedule reduction represents the best balancing of the interest of the traveling public in obtaining shorter schedules and the interest of the railroad in providing efficient freight service over a heavily used line.
 Id. at 671. The Commission adopted the 80% On-time performance baseline suggested by Amtrak. Amtrak had argued that its earlier use of a 65% Baseline had not significantly affected railroad performance because the 65% Baseline "turned out to be unrealistically low and easily surpassed." Id. at 647.
 
 
 [20]
 See note 19 Supra
 
 
 [21]
 Texas & Pacific, 348 I.C.C. at 672-73
 
 
 [22]
 See id. at 671
 
 
 [23]
 Id. at 672
 
 
 [24]
 See Brief for Commission at 62 n.29
 
 
 [25]
 National R.R. Passenger Corp. & Union Pac. R.R. Use of Tracks & Facilities & Establishment of Just Compensation, 348 I.C.C. 926, 951 (1977)
 
 
 [26]
 Texas & Pacific, 348 I.C.C. at 661
 
 
 [27]
 Id
 
 
 [28]
 To note one computation as an example, the Commission was called upon to decide how much time was needed to inspect and service Amtrak's trains at Texarkana, Arkansas. Amtrak claimed such service required one hour per trip; Texas and Pacific claimed four hours were needed. Provided with little more than conflicting claims, the Commission determined that two hours were needed for each inspection. Id. at 660
 
 
 [29]
 Accordingly, we uphold the challenged computation of train movement service, supervision, station rent, return of investment, and risk of liability
 
 
 [30]
 National R.R. Passenger Corp. & Terminal R.R. Ass'n, Use of Tracks & Facilities & Establishment of Just Compensation, 348 I.C.C. 901, 921 (1977)
 
 
 [31]
 Id. at 920
 
 
 [32]
 In this regard, we note that minimum performance standards need not necessarily force improvement in a railroad's services. Representative Dingell explained to the House of Representatives prior to enactment of the 1973 amendment, "that the railroads shall be paid above avoidable costs only on the basis of the quality of service afforded. I would point out that the quality of service afforded by the Penn Central is uniquely poor." 119 Cong.Rec. 34481 (1973). The legislative history behind the 1978 Act, In pari materia with the 1973 Act, further supports the conclusion that Congress was concerned with good, but not necessarily better, service. "The conference substitute changes the law to permit incentives for good quality track and facilities . . . . (T)he conferees (do not) intend for incentive payments to be made only for improvement in track and facilities." H.R.Rep. No. 95-1478 at 20, U.S.Code Cong. & Admin.News 1978, p. 2341. See also 124 Cong.Rec. H10133 (daily ed. September 19, 1978) (remarks of Representative Skubitz)
 
 
 [33]
 Because the 1978 amendment expands the category of costs to which the incremental cost limitation applies, See text at ---- of 197 U.S.App.D.C., at 873 of 610 F.2d, Supra, we intimate no view on whether the Commission's justifiable inability to delineate incremental service costs on the record before it in this case would also arise had the Commission been forced to distinguish between incremental and non-incremental property costs